UNITED STATES, Appellant,

v.

Jason R. GAMMONS, Seaman Recruit,
U.S. Coast Guard, Appellee.

No. 98–5031.
Crim.App. No. 1078.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 7, 1998.

Decided July 30, 1999.

EFFRON, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN, CRAWFORD, and GIERKE, JJ., joined.

For Appellant: *Lieutenant Susan Polizzotto* (argued); *Lieutenant William G. Rospars.*

For Appellee: *Lieutenant Sandra K. Selman* (argued).

1. *See* 32 MJ at 160 n. *.

Judge EFFRON delivered the opinion of the Court.

A special court-martial composed of a military judge sitting alone convicted appellee, pursuant to his pleas, of using marijuana (4 specifications) and using and distributing LSD, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. He was sentenced to a bad-conduct discharge, confinement for 3 months, and forfeiture of one-third of his pay per month for 3 months. The convening authority approved the sentence, except that confinement in excess of 60 days was suspended for 12 months.

The Court of Criminal Appeals *en banc* affirmed the findings, but ordered a rehearing on sentence, 47 MJ 766, 768 (1997). The court held that a record of nonjudicial punishment under Article 15, UCMJ, 10 USC § 815, for the same conduct that was the subject of trial on the merits had been considered improperly during sentencing, citing *United States v. Pierce*, 27 MJ 367 (CMA 1989). Upon reconsideration en banc, the Court of Criminal Appeals adhered to its decision and ordered that the record of nonjudicial punishment "be expunged from Appellant's record and all rights, privileges, and property of which Appellant has been deprived by virtue of that nonjudicial punishment shall be restored prior to the rehearing on sentence." 48 MJ 762, 766 (1998).

Pursuant to Article 67(a)(2), UCMJ, 10 USC § 867(a)(2) (1994), the General Counsel of the Department of Transportation[1] certified the following issues for consideration by our Court:

I. WHETHER THE COAST GUARD COURT OF CRIMINAL APPEALS ERRED IN HOLDING, AS A MATTER OF LAW, THAT THE TRIAL COUNSEL'S USE OF A RECORD OF THE ACCUSED'S NONJUDICIAL PUNISHMENT (NJP) AMOUNTED TO PLAIN ERROR UNDER *UNITED STATES V. PIERCE*, EVEN THOUGH:

(A) THE NJP WAS USED AS AN AGGRAVATING CIRCUMSTANCE OF A

LATER SIMILAR CRIME FOR WHICH THE ACCUSED WAS CONVICTED;

(B) THE DEFENSE STATED THAT IT HAD NO OBJECTION TO THE TRIAL COUNSEL'S USE OF THE NJP; AND

(C) UNDER THE CIRCUMSTANCES THE INTRODUCTION OF THE REC- ORD OF NJP WAS THE EQUIVALENT OF AN INTRODUCTION BY THE DE- FENSE.

II. WHETHER THE COAST GUARD COURT OF CRIMINAL APPEALS ERRED IN ORDERING EXPUNGE- MENT OF A RECORD OF NONJUDI- CIAL PUNISHMENT FROM GAM- MONS' MILITARY RECORD AND RESTORATION OF ALL RIGHTS, PRIVILEGES, AND PROPERTY PRIOR TO REHEARING ON THE SEN- TENCE.

We hold that consideration of appellant's nonjudicial punishment (NJP) record at sentencing was not error where the defense consented to its introduction and made the first substantive reference to the record during sentencing. We further hold that the Court of Criminal Appeals erred when it set aside the sentence and ordered the NJP record to be expunged.

Part I of this opinion outlines the relationship between NJP and courts-martial for the same offense. Part II describes the manner in which appellee's prior NJP was used during sentencing in the present case. Part III analyzes applicable Double Jeopardy considerations, the gatekeeper role of an accused, waiver, and the lower court's order to expunge the NJP record. Part IV discusses the factors that affect consideration of a prior NJP for the same act or omission at issue in a court-martial.

## I. BACKGROUND: THE RELATIONSHIP BETWEEN NJP AND COURTS–MARTIAL

One of the hallmarks of the military justice system is the broad discretion vested in commanders to choose the appropriate disposition of alleged offenses. The critical responsibility of commanders for the morale, welfare, good order, discipline, and military effectiveness of their units traditionally has been viewed as requiring the exercise of such discretion.

The discretionary disposition authority of commanders includes the power to take no action, dismiss charges, initiate administrative actions under applicable regulations, institute NJP proceedings under Article 15, refer the matter to a summary, special, or general court-martial, or forward it to a superior commander. RCM 306, 401–405, 407, Manual for Courts–Martial, United States (1998 edition). The restrictions against unlawful command influence preclude a superior from influencing the exercise of such discretion by a subordinate. RCM 306(a); *see* Art. 37(a), UCMJ, 10 USC § 837(a). A superior commander, however, lawfully "may withhold the authority [of a subordinate] to dispose of offenses in individual cases, types of cases, or generally." RCM 306(a).

The general policy set forth in the Manual states that "[a]llegations of offenses should be disposed of in a timely manner at the lowest appropriate level of disposition...." RCM 306(b). If a superior commander disagrees with the decision of a subordinate to proceed through administrative or nonjudicial channels, the superior may direct the subordinate to forward the case for disposition by the superior or other appropriate commander, which may result in referral of the charges to a court-martial.

Disposition by NJP is governed by Article 15 of the Code and Part V of the Manual for Courts–Martial. Under Article 15, which is entitled "Commanding officer's non-judicial punishment," military commanders may impose various "disciplinary punishments for minor offenses." Art. 15(b). The disciplinary punishments rendered in an NJP proceeding may be imposed without the essential attributes of a criminal trial, such as confrontation of adverse witnesses, representation by counsel, and reliance on formal rules of evidence. *See* para. 4, Part V, Manual, *supra.*

As the Supreme Court has noted, NJP "is an administrative method of dealing with the most minor offenses." *Middendorf v. Henry,*

425 U.S. 25, 31–32, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976). Our Court has stated that a proceeding under Article 15 is not a criminal prosecution. *See, e.g., United States v. Marshall,* 45 MJ 268, 271 (1996); *accord United States v. Johnson,* 19 USCMA 464, 467, 42 CMR 66, 69 (1970). Other federal courts have come to the same conclusion. *See, e.g., Fairchild v. Lehman,* 814 F.2d 1555, 1558 (Fed.Cir.1987); *Cappella v. United States,* 224 Ct.Cl. 162, 624 F.2d 976, 980 (1980); *but cf. State v. Ivie,* 136 Wash.2d 173, 961 P.2d 941 (1998) (treating NJP as a criminal prosecution for purposes of state law).

■ The defense of former jeopardy in military law, as established by Congress in Article 44, UCMJ, 10 USC § 844, does not extend to cases in which there has been prior nonjudicial punishment for the same act or omission. *See United States v. Fretwell,* 11 USCMA 377, 379, 29 CMR 193, 195 (1960). Congress has provided expressly in Article 15(f) that a prior NJP does not necessarily bar a subsequent criminal proceeding in a court-martial:

> The imposition and enforcement of disciplinary punishment under this article for any act or omission is not a bar to trial by court-martial for a serious crime or offense growing out of the same act or omission, and not properly punishable under this article....

Under RCM 907(b)(2)(D)(iv), which implements Article 15(f), a defense motion to dismiss a charge may be based on "[p]rior punishment under ... Article 15 for the same offense, if that offense was minor." The motion is waived if not asserted by the accused at trial. RCM 907(b)(2).

The Manual makes clear that the process of determining whether an offense is "minor" involves the exercise of command discretion rather than application of a precise formula:

> Whether an offense is minor depends on several factors: the nature of the offense and the circumstances surrounding its commission; the offender's age, rank, duty assignment, record and experience; and the maximum sentence imposable for the offense if tried by general court-martial.

Ordinarily, a minor offense is an offense which the maximum sentence imposable would not include a dishonorable discharge or confinement for longer than 1 year if tried by a general court-martial. The decision whether an offense is "minor" is a matter of discretion for the commander imposing nonjudicial punishment, but nonjudicial punishment for an offense other than a minor offense (even though thought by the commander to be minor) is not a bar to trial by court-martial for the same offense.

Para. 1e, Part V; *see* Drafters' Analysis, Manual, *supra* at A24–1.

If an offense that resulted in NJP is the subject of a subsequent trial by court-martial resulting in a conviction, Article 15(f) provides that

> the fact that a disciplinary punishment has been enforced may be shown by the accused upon trial, and when so shown shall be considered in determining the measure of punishment to be adjudged in the event of a finding of guilty.

During sentencing, the defense may present matters in mitigation, including "the fact that nonjudicial punishment under Article 15 has been imposed for an offense growing out of the same act or omission that constitutes the offense of which the accused has been found guilty." RCM 1001(c)(1)(B). If such matter is presented, "this fact must be considered in determining an appropriate sentence." Para. 1e, Part V.

In *United States v. Pierce,* 27 MJ 367 (1989), our Court considered the relationship between the two features of Article 15(f)— the limited scope of the former-punishment defense and the impact of a prior NJP during sentencing. *Pierce* reaffirmed the holding in *Fretwell* that prosecution for a serious offense is not barred by prior nonjudicial punishment for the same offense. 27 MJ at 368.

*Pierce* also addressed the requirement in Article 15(f) to consider in mitigation of the sentence any prior NJP for the same offense introduced into evidence by the accused. We observed that such consideration was designed to ensure that the accused is not

punished twice for the same offense. *Id.* at 369. In light of that purpose, *Pierce* ordered a remand for the court below to either determine what the military judge's consideration of the prior NJP implied or to adjust the sentence to ensure that Pierce "was not twice punished." *Id.* at 370. The issues that are now before us address the continuing validity of the holdings in *Pierce,* as well as the extent to which dicta in *Pierce* should govern the present case.

With respect to these issues, we note that our review in this appeal extends only to the impact of prior NJP proceedings upon the present case. As we noted in *United States v. Edwards,* 46 MJ 41, 43 (1997), "[t]he jurisdiction of our Court does not extend to direct review of nonjudicial punishment proceedings."

## II. CONSIDERATION OF GAMMONS' PRIOR NJP DURING SENTENCING

Pursuant to his pleas, the military judge found the appellee guilty of six offenses involving use or distribution of marijuana and LSD. At the outset of the sentencing proceeding, in accordance with RCM 1001(a)(1)(A)(i) & (ii) and standard practice, the military judge asked trial counsel to inform the court of the "pay and service" of the accused.

Trial counsel provided the military judge with exhibits containing both positive and negative information, including evidence of appellee's marital status, awards and decorations, evaluations, other personal data, occupational certification, and various disciplinary matters, including records of nonjudicial punishment. *See* RCM 1001(b)(2) (service records include "evidence of any disciplinary actions including punishments under Article 15"). The military judge then sought to ensure that defense counsel was aware of the content of the documents, particularly in view of the apparent relationship of the NJP records to the present proceedings. The record of trial reflects that defense counsel had been provided with copies of the exhibits prior to trial and that the defense intended to make affirmative use of the NJP in its presentation of evidence in mitigation:

> MJ: [*Receives document from Bailiff.*] Defense Counsel have [sic] any objections to these exhibits?
>
> DC: Sir, the defense has no objection.
>
> MJ: And you've seen each of these previously?
>
> DC: I have, sir.
>
> MJ: [*Reviews the documents.*] Defense counsel, I'm looking at Prosecution Exhibit 3 that appears to be coinciding with at least one of the charges, if not several. Are you aware of that?
>
> DC: Yes, sir.
>
> MJ: Do you intend to address that in your case in E[xtenuation] and M[itigation]?
>
> DC: Yes, sir.

(Italics in original.) During the presentation of the prosecution's evidence on sentencing, trial counsel did not emphasize or otherwise discuss the content or nature of the NJP records.

During the defense sentencing case, appellee made an unsworn statement which outlined his military career, his father's chronic alcoholism, and his own involvement with drugs and alcohol. *See* RCM 1001(c)(2)(C). With respect to the NJP record, appellee said:

> When confronted with using—with the using drugs, I admitted everything and received punishment at Captain's Mast.

After the defense concluded its sentencing case, trial counsel presented the Government's sentencing argument, which included the following observations with respect to the NJP record:

> [T]he accused, after being taken to Captain's Mast for marijuana use on numerous occasions, including while underway on board the Coast Guard Cutter MORGANTHAU, continued to disregard the law. Only about four days after being taken to Captain's Mast, he decided to thumb his nose on the law and the Coast Guard by using and distributing LSD.

Defense counsel did not object to trial counsel's argument. In his sentencing argument, defense counsel emphasized the alco-

holism of appellant's father, the relationship between appellant's drinking problems and his use of drugs, and noted:

> The Captain of the MORGENTHAU punished Seaman Recruit Gammons at Captain's Mast for that marijuana use, and Seaman Recruit Gammons was reduced and was fined $200.00 for that use.[2]

Defense counsel did not ask the military judge to limit the consideration given to the NJP record.

## III. ANALYSIS

### A. DOUBLE JEOPARDY

The Constitution's Fifth Amendment Double Jeopardy Clause states: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb[.]" The court below cited the Supreme Court's decision in *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), for the proposition that trial by court-martial should be barred by a prior NJP proceeding. The court invited us to overrule the line of cases extending from *Fretwell* to *Pierce*, *see* Part I, *supra*, and hold that Congress acted unconstitutionally in Article 15(f) when it authorized trial for a serious offense previously considered in an NJP proceeding. 48 MJ at 764.

*Hudson* provides a very weak reed for the proposition that a proceeding denominated by Congress as "nonjudicial," which provides only for rather modest penalties, and which does not constitute a criminal conviction, nonetheless constitutes a criminal proceeding under the Fifth Amendment.

At the very outset of *Hudson*, the Supreme Court emphasized that imposition of penalties, even the harsh penalty of occupational debarment, would not transform an administrative procedure into a criminal proceeding under the Fifth Amendment:

> The Government administratively imposed monetary penalties and occupational debarment on petitioners for violation of federal banking statutes, and later criminally indicted them for essentially the same conduct. We hold that the Double Jeopardy Clause of the Fifth Amendment is not a bar to the later criminal proceedings because the administrative proceedings were civil, not criminal.

522 U.S. at 95–96, 118 S.Ct. at 491.

With respect to successive proceedings resulting in punishment, the Court emphasized

> that the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, in common parlance, be described as punishment. The Clause protects only against the imposition of multiple *criminal* punishments for the same offense.

522 U.S. at 98–99, 118 S.C.Ct. at 493 (citations and internal quotation marks omitted; emphasis in original). The Court expressed serious concern about "novel double jeopardy claims" generated by its prior double jeopardy decisions and sought to confine the scope of such claims by establishing a two-part framework for analyzing double jeopardy issues. *Id.* at 98, 118 S.Ct. at 493.

■ The first part of the *Hudson* test requires the reviewing court to determine "whether the legislature, 'in establishing the penalizing mechanism, indicated ... expressly or impliedly a preference for' " a civil or a criminal label. 522 U.S. at 99, 118 S.Ct. at 493 (quoting *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)).

The second part of the *Hudson* test requires the reviewing court to determine "whether the statutory scheme" is "so punitive either in purpose or effect" as to negate the legislative intention to create a civil remedy. 522 U.S. at 99, 118 S.Ct. at 493 (*quoting Ward, supra* at 248–49, 100 S.Ct. 2636). The Court suggested a number of factors that could "provide useful guideposts" in making this determination.[3] The Court em-

---

2. Defense counsel apparently referred colloquially to the forfeiture as a "fine." The NJP record reflects reduction to E–1 and forfeiture, not a fine, of $200.00.

3. (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only upon a finding of *scienter*"; "(4) whether its

phasized that such "factors must be considered in" the context of "the statute on its face" and that " 'only the clearest proof' will ... transform what has been denominated a civil remedy into a criminal penalty." 522 U.S. at 99–100, 118 S.Ct. at 493 (*quoting Ward, supra* at 249, 100 S.Ct. 2636).

■ Under *Hudson's* two-part analysis, Article 15(f) does not violate the Double Jeopardy Clause. With respect to the first step, the title of the legislation—"Commanding officer's non-judicial punishment"—underscores the legislative intent to separate NJP from the judicial procedures of the military's criminal law forum, the court-martial. As noted in the report of the Senate Armed Services Committee accompanying the comprehensive amendments to Article 15 in 1962: "Since the punishment is nonjudicial, it is not considered as a conviction of a crime and in this sense has no connection with the military court-martial system." S.Rep. No. 1911, 87th Cong., 2d Sess. (1962), *reprinted* in 1962 U.S.Code Congressional and Administrative News at 2380 (hereafter cited as 1962 Senate Report); *accord* H.R.Rep. No. 1612, 87th Cong., 2d Sess. 1–2 (1962).

With respect to the second part of the *Hudson* test, the structure and purpose of NJP demonstrate that Congress has not created a set of penalties "so punitive" that it has transformed NJP into a criminal penalty. Most of the punishments that may be imposed in an NJP proceeding affect the non-criminal field of military personnel administration. These penalties include reduction in rank and forfeiture of pay—the punishments at issue in the present case—as well as admonitions, reprimands, and detention of pay. Art. 15(b). These punishments do not include anything equivalent to the serious penalty of occupational debarment, yet the Su-

preme Court in *Hudson* viewed that as not so punitive as to implicate the Double Jeopardy Clause. Likewise, the punishments under Article 15 do not include the monetary penalty traditionally associated with the criminal law—a fine. *Cf., e.g., Hudson*, 522 U.S. at 97–98, 105, 118 S.Ct. at 492–93, 496 (penalties ranging from $12,500.00 to $16,-500.00 did not preclude a subsequent criminal trial). There is no authority under Article 15 to impose the quintessential criminal law penalty—confinement at hard labor. Although a number of limitations on freedom of movement may be imposed under NJP, these are strictly limited in time.[4] Particularly in the context of military life—where a service-member who has committed no disciplinary infraction can be deployed involuntarily to a distant location, separated from family and friends, restricted from leaving his or her vessel or post, required to live for months at a time in extremely confined quarters on board a ship at sea or in a tent in the field, and ordered to perform duties that may lead to the ultimate sacrifice—the limitations on movement under Article 15 are far less onerous than the restriction approved in *Kansas v. Hendricks*, 521 U.S. 346, 354, 369–70, 117 S.Ct. 2072, 2078, 2086, 138 L.Ed.2d 501 (1997) (involuntary civil commitment of a convicted person designated as a "sexually violent predator" under the state statute following a criminal conviction covering the same conduct held not to violate the Double Jeopardy Clause).

The limitations on the degree of permissible punishment under Article 15 are consistent with the clear congressional intent to separate NJP from the criminal law consequences of a court-martial. As noted in the Senate Report on the legislation establishing the authority for "correctional custody":

operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."
522 U.S. at 99–100, 118 S.Ct. at 493 (*quoting Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

4. Depending on the rank of the officer imposing the punishment and status of the servicemember, the following may be imposed under Article 15(b): restriction to specified limits for up to 60 days, correctional custody or arrest in quarters for up to 30 days, and extra duties for up to 45 days. If attached to or embarked in a vessel, up to 3 days' confinement on bread and water or reduced rations is authorized, but this is a rarely used punishment. Art. 15(b).

"[C]orrectional custody" . . . is defined as physical restraint during duty or nonduty hours and may include extra duties, fatigue duties, or hard labor.

The purpose of correctional custody is to exercise close supervision over an individual to the end that the cause of his behavior that resulted in the commission of an offense may be corrected, without stigmatizing him with a sentence to "confinement."

1962 Senate Report, *supra* at 2384.

Because NJP is used to address offenses arising under the UCMJ that can be punished in the criminal law forum of a court-martial, Article 15 clearly implicates a number of the "guidepost" factors suggested by the second part of the *Hudson* test. The Supreme Court has emphasized, however, that these factors are "neither exhaustive nor dispositive." *Ward, supra* at 249, 100 S.Ct. 2636. Moreover, the guidepost factors require us to look not only at the similarities to criminal law procedures, but also to determine whether there is a non-criminal law purpose that can rationally be assigned to NJP, and whether the punishments that can be imposed are excessive to the needs of that non-criminal purpose. *See* 522 U.S. at 99–100, 118 S.Ct. at 493.

With respect to NJP, there is a clear congressional purpose to serve the disciplinary needs of the armed forces. Discipline, which entails the control of armed forces through prompt obedience of superior orders, is an integral component of successful military operations. Discipline is not achieved exclusively or even primarily through use or threat of the military criminal law process, the court-martial. Commanders use a combination of tools to maintain discipline including leadership by example, training, corrective measures, administrative actions authorized by applicable regulations, and NJP—as well as courts-martial. As noted in a standard volume on military leadership:

The relationship between a commander's leadership responsibility, the standard of discipline maintained within the unit, and the commander's use of the authority to punish under Art. 15, are subjects so close-ly tied together as to constitute in some respects a single function of command.

Lawrence P. Crocker, *Army Officer's Guide* 283 (45th ed.1990).

In providing for nonjudicial punishment, Congress sought to enhance discipline in a manner that would reduce the adverse impact on the servicemember and the service that can arise from resort to the criminal law forum of a court-martial. In support of the comprehensive amendments to Article 15 in 1962, the Senate Armed Services Committee expressly emphasized the role of nonjudicial punishment in minimizing the adverse impact of a court-martial conviction on individual servicemembers:

In most cases, a court-martial results in a serious impairment of the services of an officer or enlisted man. Such a conviction stigmatizes a person with a criminal conviction on his record, which not only remains throughout his military career, but follows him into civilian life. It may well interfere with his civilian job opportunities, as for example, when he is required to show on a questionnaire whether he has ever been convicted, and it may adversely reflect on him if he is involved in difficulty with civilian law-enforcement agencies. The bill, by providing increased authority for nonjudicial punishment, will enable commanders to deal promptly and efficiently with problems of discipline. At the same time, the increased nonjudicial authority should permit the services to reduce substantially the number of court-martials for minor offenses, which result in stigmatizing and impairing the efficiency and morale of the person concerned.

1962 Senate Report, *supra* at 2381–82. Given those concerns, we conclude under the *Hudson* guideposts that the complementary goals of enhancing military discipline while reducing the adverse impact of convictions on servicemembers provide a rational non-criminal justification for NJP and that the relatively modest penalties available under NJP are not so excessive as to transform NJP into a criminal proceeding under the Double Jeopardy Clause.

In summary, we disagree with the suggestion of the court below that a court-martial following NJP for the same act or omission violates the Double Jeopardy Clause of the Fifth Amendment, particularly in view of the specific congressional designation of NJP as "nonjudicial," the express language in Article 15(f) providing that a prior NJP does not bar a subsequent trial, the non-criminal law purposes of NJP, the relatively modest punishments imposable, and the Supreme Court's admonition in *Hudson* that "'only the clearest proof' will ... transform what has been denominated a civil remedy into a criminal penalty," 522 U.S. at 100, 118 S.Ct. at 493.

It is also noteworthy in the present case that appellee's NJP consisted of a one-step reduction in grade and a modest forfeiture of pay for 1 month, penalties that are clearly administrative in nature. If this case had arisen in a civilian context, it is unlikely that such minor employment-related sanctions would be viewed as establishing a criminal law punishment under the stringent test established in *Hudson*. Moreover, even if *Hudson* did not establish such a high hurdle, the deference due to congressional judgments about the rights of servicemembers would require us to apply a similarly high standard before declaring that an act of Congress had unconstitutionally transformed a nonjudicial military personnel action into a criminal proceeding under the Fifth Amendment. *See, e.g., Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) ("Congress is permitted to legislate both with greater breadth and with greater flexibility" with respect to matters involving military discipline); *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976) (declining to apply the Sixth Amendment right to counsel to summary courts-martial).

## B. THE ACCUSED AS GATEKEEPER

■ Article 15(f) provides that "the fact that a disciplinary punishment has been enforced may be shown by the accused upon trial, and when so shown shall be considered in determining the measure of punishment...." When Congress enacted Article 15 to replace its predecessor, Article of War 104, as well as at the time of the 1962 amendments, the Manual for Courts–Martial permitted the defense to introduce a prior NJP in extenuation or mitigation, but did not authorize the prosecution to introduce prior NJP records in aggravation, regardless whether the NJP involved the same or a different offense. *See* para. 79e, Manual for Courts–Martial, U.S. Army, 1949; para. 75c (4), Manual for Courts–Martial, United States, 1951; *United States v. Johnson*, 19 USCMA 464, 468, 42 CMR 66, 70 (1970) (upholding use of Article 15 by prosecution after August 1, 1969). The Manual subsequently was revised to permit a wide variety of personnel matters, including prior NJP records, to be considered during sentencing, consistent with the broad scope of sentencing information presented during federal civilian criminal proceedings. Para. 75d, Manual for Courts–Martial, United States, 1969 (Revised edition); *see Johnson, supra* at 465–66, 42 CMR at 67–68. The 1969 revision, however, did not focus on the circumstances where the NJP and the court-martial involved the same act or omission, or address the relationship between the statutory requirements of Article 15(f) and the regulatory changes made in the Manual.

The relationship between Article 15(f) and use of NJP records during sentencing was addressed by this Court in *United States v. Pierce*, 27 MJ 367 (1989). *Pierce* concluded that where the NJP and the court-martial involved the same offense, Article 15(f) required that the defense, not the prosecution, determine whether the NJP should be presented. 27 MJ at 369 ("Article 15(f) leaves it to the discretion of the *accused* whether the prior punishment will be revealed to the court-martial for consideration on sentencing." (Emphasis in original)). In the context in which Article 15(f) was enacted and amended, and in view of the fact that Congress has made no changes in Article 15(f) in the decade since the opinion in *Pierce* was issued, we adhere to the conclusion in *Pierce* that Article 15(f) establishes the accused as the gatekeeper with respect to consideration of an NJP record during a court-martial involving the same act or omission.

In the circumstances of the present case, the military judge took appropriate action to ensure that the prior NJP was introduced in a manner consistent with the gatekeeper role of the defense. When trial counsel, at the outset of the sentencing proceeding, presented various positive and negative items from appellee's service record, including the NJP, the military judge brought the NJP to the attention of defense counsel. The military judge ascertained that the defense was aware of its contents and intended to make affirmative use of the NJP in its sentencing case. *See* 51 MJ at 175–76. The first substantive use of the NJP was made by the defense when the accused referred to the NJP in his unsworn statement to show that he "admitted everything and received punishment." We see no material prejudice to the gatekeeper rights of appellee in this sequence in a judge-alone trial, even though it would have been preferable to delay introduction of the NJP until the defense made substantive use of it. *See* Art. 59(a), UCMJ, 10 USC § 859(a).

At the next stage in the sequence, trial counsel commented negatively on the NJP during the Government's sentencing argument by noting that appellee committed further misconduct shortly after being punished under Article 15. The defense offered no objection and, during its sentencing argument, referred to the specific punishments that appellee had already received under NJP.

The issue before us is a statutory question. In order to fulfill the purposes of Article 15(f), is it necessary to apply the broad language of the dicta in *Pierce*, 27 MJ at 369 (stating that "the nonjudicial punishment may not be used for *any* purpose at trial" (emphasis in original)) to prevent any prosecution reference to an NJP after the NJP has been brought into play by the defense?

The purpose of Article 15(f) is to prevent the accused from being punished twice for the same offense as a matter of statutory law even though such successive punishment is otherwise permissible as a matter of constitutional law. Article 15(f) provides an accused with two means of enforcing this statutory purpose: (1) a motion to dismiss the charge on the grounds of former punishment for a minor offense; and (2) as the gatekeeper on the question as to whether an NJP for a serious offense will be brought to the attention of the sentencing authority.

The broad language of *Pierce* supports the gatekeeper role in most circumstances. However, where the accused—as gatekeeper—has allowed the NJP to become an issue in the sentencing proceeding, the *Pierce* dicta could be used to transform the shield of Article 15(f) into a sword that misinforms or misleads the court-martial.

■ If the accused, as gatekeeper, chooses not to introduce evidence of a prior NJP, the prosecution normally will be precluded from introducing or commenting on such a record. The situation is different, however, where the accused makes a statement that clearly implies the absence of a prior NJP in a manner that clearly is material to the sentencing proceeding. For example, if a servicemember punished under Article 15 for violating a general order subsequently violates a second order, and both matters are referred to trial by court-martial, the accused should not be permitted to assert with impunity that at the time he violated the second order, he had no prior disciplinary infractions.

■ If the accused, as gatekeeper, chooses to introduce evidence of a prior NJP, the prosecution may introduce evidence, consistent with the rules of evidence, that is necessary to ensure that the information is accurate. The designation of the accused as the gatekeeper under Article 15(f) does not require us to permit an accused to provide inaccurate or misleading information to the court-martial or to preclude the prosecution from making a fair comment on matters reasonably raised or implied by the defense references to the NJP.[5]

---

**5.** Because the prior NJP involves the same acts or omissions for which the accused stands convicted at the court-martial, the gatekeeper role of the accused under Article 15(f) does not preclude the prosecution from referring to those acts or omissions during sentencing proceedings. The gatekeeper role extends only to the question whether punishment under NJP proceedings may

## C. WAIVER

■ In the present case, the defense did not object to consideration of the NJP when the military judge brought it to defense counsel's attention at the outset of the sentencing proceeding or to trial counsel's reference to the NJP during the sentencing argument. Even if the Government's reference to the NJP constituted error, the failure to object constituted waiver under the applicable rules. RCM 1001(b)(2) ("[o]bjections not asserted are waived" with respect to sentencing matters concerning personnel records of an accused); *cf.* RCM 1001(g) (failure to object to improper argument constitutes waiver).

The court below declined to affirm on the basis of waiver, noting three grounds for reversal. First, the court concluded that because the error was of constitutional dimension, waiver would not apply unless the record contained an explanation to the accused by the military judge of the rights being waived and a statement by the accused confirming an intentional relinquishment of those rights. 48 MJ at 764; 47 MJ at 767–68. Although *Pierce* referred in dicta to due process concerns, 27 MJ at 369 and n. 4, our holding in that case was based on statutory interpretation, not constitutional analysis. *See* Part IIIA, *supra.*

■ Use of a prior NJP at sentencing, while raising important issues, is not so critical as to require a detailed inquiry by the military judge and affirmative responses by the accused concerning waiver. Because the accused is the gatekeeper under Article 15(f), it is the responsibility of defense counsel to advise the accused of the significance of that role. The decision as to whether a prior NJP should be introduced depends on circumstances highly particular to the offenses at issue and the full range of issues involved in the sentencing proceeding. Should the advice of counsel be so defective that it affects the fairness of the proceedings, it can be tested under the standards applicable to ineffective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott,* 24 MJ 186, 187 (CMA 1987).

be introduced during a subsequent court-martial

■ The court below cited the doctrine of "plain error" as a basis for not relying on waiver. 48 MJ at 765. At a minimum, the doctrine of plain error is reserved for cases in which an error materially prejudices the substantial rights of an accused. *See* Art. 59(a); *United States v. Powell,* 49 MJ 460 (1998); *see also id.* at 466 (Sullivan, J., concurring in the result) (applying an even more stringent plain-error test).

■ The court below also stated that it would not find waiver in light of the comment in *United States v. Claxton,* 32 MJ 159, 162 (CMA 1991) that the Courts of Criminal Appeals possess plenary review authority "to do justice." 48 MJ at 765. *Claxton,* however, did not relieve the Courts of Criminal Appeals of the responsibility to follow Article 59(a), which provides that a "sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." *See Powell,* 49 MJ at 464. In the present case—where the military judge ascertained the defense plan to make use of the NJP, the first substantive use of the NJP was made by the defense, and the comments by trial counsel simply highlighted information about the sequence of events that was already before the military judge—we do not find that the circumstances require invocation of plain error.

## D. THE ORDER TO EXPUNGE THE NJP FROM APPELLEE'S MILITARY PERSONNEL RECORD

■ The court below held that any prior punishment under Article 15 must be treated "as void." The court noted that Article 15(f) refers to "serious" offenses as being "not properly punishable" under Article 15. Because only "serious" offenses may be tried after NJP is imposed for the same offense, the court concluded that designation of an offense as "serious" necessarily implied that any earlier designation of the offense as minor was erroneous and that the offense was not properly punishable under NJP. The

involving the same acts or omissions.

court further declared that evidence of the NJP must be "expunged from Appellant's record and all lost rights, privileges, and property restored before a sentence rehearing is held." The court added that such actions would render "unnecessary" any "crediting of prior punishment" "except for those aspects of imposed punishment that cannot be restored." Under the lower court's ruling, any court-martial involving a prior NJP for the same act or omission presumably would be halted upon return of a conviction so that personnel officials could void the NJP and restore lost rights, privileges, and property. Under this ruling, even after the Article 15 had been voided, the accused would still retain the right to introduce evidence of the prior NJP on the grounds that voiding and restoration had not adequately addressed the effect of the prior punishment. *See* 48 MJ at 765.

 The lower court's interpretation of Article 15 reflects an assumption that when a commander determines that an offense is sufficiently "serious" to warrant trial by court-martial, that determination renders illegal any prior determination that the offense should be disposed of under Article 15 as a "minor" offense. The lower court's opinion assumes that there is an identifiable line between "minor" and "serious" offenses. There is no precise formula, however, for determining whether an offense is "minor" or "serious." *See* para. 1e, Part V; *United States v. Harding*, 11 USCMA 674, 29 CMR 490 (1960). The Manual makes it clear that "[t]he decision whether an offense is 'minor' *is a matter of discretion for the commander* imposing nonjudicial punishment...." Para. 1e (emphasis added). The vesting of discretion, as opposed to establishment of a formula, permits commanders to treat nominally serious offenses as minor, and promotes the policy of disposing of allegations at the lowest possible level based upon individual circumstances. *See* RCM 306(b) and Discussion; RCM 306(a), Discussion.

 When a decision involves exercise of discretion rather than application of a formula, the person exercising discretion is empowered by law to select among a range of legally permissible alternatives. *See Secretary of Agriculture v. Central Roig Refining Co.*, 338 U.S. 604, 613, 614, 70 S.Ct. 403, 94 L.Ed. 381 (1950). It is reasonable and proper for one commander to view an offense as appropriate for disposition under NJP and for another commander (or the same commander upon further consideration) to view it as requiring trial by court-martial. The fact that the second commander views the offense differently from the first does not mean that the action of the first commander in imposing NJP was void, absent an abuse of discretion. *Compare Cappella*, 624 F.2d at 978–79, *with Hagarty v. United States*, 196 Ct.Cl. 66, 449 F.2d 352 (1971); *see Pierce*, 27 MJ at 368–69 (suggesting that a trial after NJP for the same offense would be impermissible if discretion was abused on the basis of factors such as "sinister design, evil motive, [or] bad faith"). The differing dispositions simply mean that the second commander made a different choice within the range of permissible alternatives for disposing of the charges. So long as both commanders acted within their permissible range of discretion, there is no basis for treating the first action as void.

In the present case, appellee did not appeal his NJP as impermissible on the grounds that it was not "minor," or raise such a challenge at trial. We decline to hold that a mere difference between commanders in the exercise of discretion transforms a lawful NJP disposition decision into a void act.

## IV. FACTORS AFFECTING CONSIDERATION OF A PRIOR NJP FOR THE SAME ACT OR OMISSION AT ISSUE IN A COURT–MARTIAL

### A. PRESENTATION OF EVIDENCE

The role of the accused as gatekeeper under Article 15(f), as discussed in Part IIIB of this opinion, provides a number of options for the accused. The accused must consider whether, and under what circumstances, a prior NJP record should be brought to the attention of a court-martial involving the same act or omission punished under Article 15.

■ The accused, as gatekeeper, may choose whether to introduce the record of a prior NJP for the same act or omission covered by a court-martial finding and may also choose the forum for making such a presentation. The accused may: (1) introduce the record of the prior NJP for consideration by the court-martial during sentencing; (2) introduce the record of the prior NJP during an Article 39(a), UCMJ, 10 USC § 839(a), session for purposes of adjudicating credit to be applied against the adjudged sentence; (3) defer introduction of the record of the prior NJP during trial and present it to the convening authority prior to action on the sentence; or (4) choose not to bring the record of the prior NJP to the attention of any sentencing authority. In that regard, we note that an accused may have sound reasons for not presenting the record of the prior NJP to any sentencing authority. Absent a collateral issue, such as ineffective assistance of counsel, failure to raise the issue of mitigation based upon the record of a previous NJP for the same offense prior to action by the convening authority waives an allegation that the court-martial or convening authority erred by failing to consider the record of the prior NJP.

■ Each of the choices available to the accused has differing consequences with respect to the manner in which the prosecution may use the record of a prior NJP. If the accused does not present evidence or argument concerning a prior NJP during sentencing or presents such evidence only during an Article 39(a) session called for the purpose of adjudicating credit, the accused has not opened the gate. As we noted in *Pierce*, the prosecution may not introduce such evidence (*e.g.*, in an effort to show that the accused is a recidivist) or comment on its absence during the merits of the sentencing case. Likewise, the prosecution may not use such evidence in rebuttal of general evidence concerning the military character of the accused. If, however, the accused during the sentencing case offers evidence or argument which would attempt to establish as a material fact in issue the absence of a prior NJP for the same offense, the prosecution may introduce information about the prior NJP to the extent necessary to ensure that the sentencing authority is not misled. For example, in a case involving multiple offenses, if the accused asserts that no one brought to his attention that his first act was improper, the prosecution could introduce an NJP record covering the first offense.

■ If the accused presents evidence of the prior NJP on the merits during sentencing in a manner that merely refers to the NJP and requests appropriate credit under Article 15(f), the same considerations normally preclude the prosecution from presenting evidence or argument that would use the NJP against the accused. If, however, the defense information is inaccurate or misleading, the prosecution may provide such information and argument as may be necessary to ensure that the sentencing authority is not misled. Moreover, once the accused has brought the NJP to the attention of the court-martial, the prosecution may offer fair comment on the NJP in the context of matters already apparent from the record (*e.g.*, if other charges involve events occurring after the NJP, it would be appropriate to make fair comment upon that fact).

■ If the accused on the merits during sentencing refers to the NJP for purposes beyond a mere request for Article 15(f) credit (*e.g.*, to discuss the circumstances of the NJP, to show contrition, or to demonstrate acceptance of guilt), the prosecution may provide appropriate rebuttal evidence and may make fair comment on the defense presentation.

## B. CREDIT FOR PRIOR PUNISHMENT

Under *Pierce*, "an accused must be given *complete* credit for any and all nonjudicial punishment suffered: day-for-day, dollar-for-dollar, stripe-for-stripe." 27 MJ at 369 (emphasis in original). *Pierce* also observed that "[b]ecause the types of punishment administered nonjudicially and those adjudged by courts-martial are not always identical, there may be some difficulties in reconciliation" and suggested utilization of a table of equivalent punishments to facilitate the process of

granting such credit. *Id.* To date, the Executive Branch has chosen not to promulgate such a table. While certain matters under NJP, such as admonitions and reprimands, may require a degree of flexibility in providing an appropriate credit, matters involving pay, extra duties, and restrictions on liberty should be susceptible to standard credits. In the absence of such credits, however, it is the responsibility of the military judge, the convening authority, or the Court of Criminal Appeals, as appropriate, to make such assessment.

In that regard, we offer the following guidance to assist reviewing authorities in determining whether appropriate credit has been provided. If the accused offers the record of a prior NJP during sentencing by members for the purposes of evidence in mitigation, the military judge must instruct the members on the specific credit to be given for the prior punishment under NJP. In the alternative, the accused may request that the instruction simply ask that the panel give consideration to the punishment imposed in a prior NJP in adjudging the sentence. Because Article 15(f) states that the panel shall consider the punishment imposed in a prior NJP when introduced by the accused, the military judge is obligated to give an appropriate instruction. *See* RCM 1005, Manual, *supra*. In a judge-alone trial, if the accused offers the record of a prior NJP for the purposes of evidence in mitigation during sentencing, the military judge will state on the record the specific credit awarded for the prior punishment.

If the accused chooses to raise the issue of credit for prior punishment during an Article 39(a) session rather than on the merits during sentencing, the military judge will adjudicate the specific credit to be applied by the convening authority against the adjudged sentence in a manner similar to adjudication of credit for illegal pretrial confinement. If the accused chooses to raise the issue of credit for prior punishment before the convening authority, the convening authority will identify any credit against the sentence provided on the basis of the prior NJP punishment. Likewise, if the issue is raised before the Court of Criminal Appeals, that court will identify any such credit.

In the present case, the lower court was unable to discern whether either the military judge or the convening authority appropriately credited the prior NJP in the sentencing process, so it ordered a rehearing on sentence. 48 MJ at 765. In *Pierce*, we held that in such circumstances, it is "appropriate" for the lower court "to either (1) ascertain from the judge an explanation of what his consideration of the nonjudicial punishment implied; or (2) adjust appellant's sentence to assure that he was not twice punished." 27 MJ at 370. If the court below determines upon remand that the record does not indicate that the military judge gave any consideration to the prior NJP, then it may either reassess the sentence or order that the case be returned to the convening authority for further action. *See Pierce, supra* at 369 ("Presumably, the best place to repose the responsibility to ensure that credit is given is the convening authority.") The convening authority may either provide appropriate credit or order a sentence rehearing.

## V. DECISION

The certified issues are answered in the affirmative.

The 1998 decision of the United States Coast Guard Court of Criminal Appeals is affirmed as to findings and set aside as to sentence. The record of trial is returned to the General Counsel of the Department of Transportation for remand to that court for further proceedings.