# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## Washington, D.C.

## UNITED STATES

### v.

## David W. CAMPBELL

## Machinery Technician Second Class, U.S. Coast Guard

## CGCMG 0136

## Docket No. 1096

## 5 July 2001

General Court-Martial convened by Commander, Coast Guard Pacific Area. Tried at Thirteenth Coast Guard District, Seattle, Washington, 29 September through 04 October 1997.

| | |
|---|---|
| Military Judge: | CAPT Robert Bruce, USCG |
| Trial Counsel: | LT(jg) Donna Ordine, USCGR |
| Assistant Trial Counsel: | LT Sean Gill, USCGR |
| Detailed Defense Counsel: | LT James Link, JAGC, USNR |
| Appellate Defense Counsel: | CDR Frederick W. Tucher, USCG |
| Appellate Government Counsel: | CDR Chris P. Reilly, USCG |
| | LT Benes Z. Aldana, USCGR |

## BEFORE
## PANEL FOUR
## BAUM, KANTOR & WESTON[1]
Appellate Military Judge

BAUM, Chief Judge:

Appellant was tried by a general court-martial composed of officers and enlisted members. Despite his pleas of not guilty, he was convicted of the following offenses: one specification of failure to obey a lawful general order; seven specifications of maltreatment of junior enlisted females; two specifications of assault consummated by a battery against two enlisted females; six specifications of indecent assault; one specification of indecent acts with another; one specification of obstructing justice; and one specification of soliciting another to commit an offense, in violation of Articles 92, 93, 128, and 134 of the Uniform Code of Military Justice

---

[1] Judge Weston retired from active duty on 1 July 2001. He participated fully in the decision in this case while still on active duty and finalized the views expressed in his separate opinion prior to his retirement.

(UCMJ), 10 U.S.C. §§ 892, 893, 928, and 934, respectively.[2]  The court members sentenced appellant to twelve months confinement, reduction to pay grade E-3, and a bad conduct discharge. The convening authority approved the sentence as adjudged, and credited Appellant with twenty-one days of confinement against the approved sentence in accordance with *United States v. Pierce*, 27 M.J. 367 (CMA 1989), based on forty-two days restriction imposed as prior nonjudicial punishment for many of the same offenses before the court.

Before this Court, Appellant has assigned nineteen errors, the last four of which were submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (CMA 1982).[3]  Four other assignments were orally argued.  They are assignments VII, IX, XIII, and XV, asserting: a violation of Fifth Amendment Due Process; improper introduction by the Government of

---

[2] The numbering of the charges and specifications against Appellant changed several times.  Given the large number of specifications involved, this has caused some confusion, which has carried over to the Court-martial Order. When charges and specifications are discussed individually in this opinion, they will be referred to with the numbering that the military judge utilized when he instructed the members on findings.  The Court-Martial Order erroneously reflects a guilty finding for specification 7 of Additional Additional Charge IV, which was specification 7 of Charge I, as instructed by the judge.  The court did not find appellant guilty of that offense and the Court-Martial Order should be corrected accordingly.

[3] I. The evidence is insufficient to support a conviction for the indecent assault and maltreatment of Fireman Apprentice W.  II. The evidence is insufficient to support a conviction for indecent assault and maltreatment of Fireman Apprentice G.  III. The evidence is insufficient to support a conviction for assault and battery and maltreatment of Petty Officer C.  IV. The evidence is insufficient to support a conviction for sexual harassment of Petty Officer T.  V. The evidence is insufficient to support a conviction for indecent assault of LTJG P.  VI. The evidence is insufficient to support a conviction for obstruction of justice and solicitation.  VII. The prosecution of exaggerated and unwarranted charges in the absence of sufficient admissible evidence to sustain a conviction violated Appellant's Fifth Amendment right to due process of law.  VIII. Trial Counsel's repeated use of leading and guilt-assuming questions and frequent reception of witness' opinions and conclusions materially prejudiced Appellant's substantial rights.  IX. Trial Counsel's preemptive and repeated introduction of bootstrapped testimony regarding Appellant's character for flirting with, mistreating, and abusing women, for his bad military character, and his immoral character, caused material prejudice to Appellant's substantial rights.  X. The military judge committed prejudicial error when, during the prosecution's case in chief, he admitted the inflammatory unit-impact testimony of the Civil Rights Officer onboard the Midgett, that was based on government conduct and inadmissible hearsay, and that served no purpose other than to inform the members that the women of the Midgett had suffered the evil effects of sexual harassment and expected a conviction.  XI. The military judge committed reversible error when, during the government's case in chief and again during sentencing, he admitted inflammatory and irrelevant hearsay evidence regarding an alleged victim's fear that she would be murdered by Appellant, notwithstanding that there was no evidence in the record, including the victim's own testimony, that Appellant had threatened her life, or that he presented a threat to her life.  XII. Appellant's substantial rights were materially prejudiced when, during the prosecution's case in chief, trial counsel improperly referred to a prosecution witness's earlier outburst regarding Appellant's prior nonjudicial punishment.  XIII. Trial Counsel improperly used Appellant's prior nonjudicial punishment for the same offenses as evidence in aggravation to argue for a more severe punishment on sentencing, in direct violation of *United States v. Pierce*, 27 M.J. 367 (CMA 1989).  XIV. Appellant was deprived of his Fifth Amendment rights against double jeopardy when he was convicted of offenses that previously were referred to nonjudicial punishment.  XV. Trial Defense Counsel failed to provide effective assistance of counsel.  XVI. Additional assignments of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (CMA 1982): (a) Appellant contends that the *ex post facto* application of Articles 57(a) and 58(b) of the UCMJ to his conviction wrongfully deprived him of his pay and rank, in violation of his constitutional rights; (b) there was never any proper survey done to establish the acceptable range of physical contact among ship's personnel; (c) Appellant has never owned a pair of boxer shorts fitting the description provided in a victim's testimony; and (d) trial counsel made repeated references to the fact that a victim was pregnant, and even allowed another one to testify at the court-martial with a baby in her arms.

testimony regarding Appellant's character; improper use by the Government as evidence in aggravation of a prior nonjudicial punishment for offenses before the court in violation of *Pierce*; and ineffectiveness of counsel. These assignments are rejected and, except for the asserted *Pierce* violation, will not be discussed. That assignment, and others relating to Appellant's prior nonjudicial punishment will be briefly discussed, along with the question of whether full and adequate credit has been given for that earlier punishment. Assignment of Error V, relating to sufficiency of the evidence of the indecent assault of a ship's commissioned officer is deemed to have merit and also will be discussed.

With respect to the other assignments asserting insufficient evidence to support convictions of indecent assault, the testimony in this case makes plain that much of the conduct for which Appellant was charged was not atypical of the sorts of "horseplay" engaged in by others on his ship, and, in fact, was reciprocated in some instances by the alleged victims. Appellant's actions with his female shipmates were certainly boorish and improper, even prejudicial to good order and discipline, but we do not believe that the vast majority of those actions could fairly be described as indecent. To be considered indecent, an act must relate to "sexual impurity which is not only grossly vulgar, obscene, and repugnant to common propriety, but tends to excite lust and deprave the morals with respect to sexual relations." Manual for Courts-Martial (MCM), Part IV, ¶ 90(c) (1995 ed.). The tickling and similar touchings committed by Appellant might have been unwelcome, but they cannot reasonably be held to be indecent.[4] While the members did not find Appellant guilty of every charged indecent assault, they did convict him of six specifications. We do not believe the evidence is either legally or factually supportive of four of those findings, including: (1) specification 1 of Charge I, indecent assault of Fireman Apprentice W by touching her sides and her buttocks and by rubbing up against her; (2) specification 3 of Charge I, indecent assault of Seaman Apprentice R by touching and rubbing her neck; (3) specification 5 of Charge I, indecent assault of Petty Officer O by putting his arm around her and telling her about a sexually explicit dream; and (4) specification 7 of Charge I, indecent assault of Fireman Apprentice G by touching her along the waist and ribs. Accordingly, we will only approve the lesser included offenses of assault consummated by a battery in those four instances. The remaining assignments do not warrant discussion and are rejected.

## Background

Appellant's behavior towards a number of junior enlisted female crewmembers on his Coast Guard cutter caused him to be taken to Captain's Mast, where nonjudicial punishment was imposed for a variety of offenses that were subsequently referred to the instant general court-martial. At Mast, Appellant received forty-two days restriction and a reduction from E-6 to E-5, which was suspended for six months and vacated three months later. When the cutter left on patrol, Appellant was ordered to serve his restriction at the Integrated Support Command (ISC) in Seattle, Washington. While restricted there, Appellant encountered Mrs. C, the wife of a shipmate, at the base exchange and persuaded her to spend some time with him. His actions that evening upset her, prompting a call to her husband and an explanation of the circumstances to

---

[4] Although most of the victims apparently did little to communicate their objections to Appellant, or anyone else for that matter, we do not think their failure to protest gave rise to a reasonable belief that they were consenting to these touchings.

3

the Coast Guard. The ensuing investigation by the Coast Guard Investigative Service (CGIS) resulted in a charge against Appellant of indecent assault for the acts of that evening and referral of the offense to the instant general court-martial, along with the charges that had been handled earlier at Captain's Mast. Several new allegations of offenses against women on the ship were also discovered, including an alleged indecent assault of one of the cutter's female commissioned officers.

## I. Sufficiency of the Evidence of Indecent Assault of a Commissioned Officer

Appellant was convicted of an indecent assault of Lieutenant Junior Grade (LT(jg)) P by "rubbing her chest and fondling her breasts." According to that officer, on the day of the offense, during an in-port period for their cutter in American Samoa, she and a number of Coast Guard Academy classmates from the cutter threw their promotion "wetting down" party for the entire crew at the local yacht club. It lasted all afternoon and into the evening. When it ended, she and a large portion of the crew went to the local dance club and bar. Upon leaving that club, she walked back to the ship with Appellant and another petty officer. She testified on direct examination:

> A. [LT(jg) P] I was walking home with – walking back to the ship with Petty Officer Campbell and Petty Officer Brandon. We didn't want to get back to the ship that early. We were not in any rush to get right back to the ship, so we stopped and were sitting on the pier. We were relaxing and chose to give each other back rubs. In the course of the back rub, Petty Officer Campbell started rubbing my chest.
>
> Q. [TC] Can you tell us, were the three of you sitting down?
>
> A. Yes. For the back rubs, we were sitting in a train style, one in front of the other.
>
> Q. You were in the middle?
>
> A. I was in the middle.
>
> Q. Can you tell us specifically how long this backrub was?
>
> A. Just for a few minutes. We were sitting in a train rubbing, looking at the stars, talking to each other – I don't think there was that much talking, but maybe a comment here and there. And then I said, switch, we all turned around and started rubbing our backs in the other direction. And again, it was maybe five minutes or so.
>
> Q. You gave him permission to rub your back?
>
> A. Yes.
>
> Q. And you were rubbing –
>
> A. At that point I was rubbing Petty Officer Brandon's back.
>
> Q. Describe how he touched your breast. Describe the back rub and then how he touched your breast.
>
> A. The back rub was just your general neck, shoulders, back. His hands came around down the ribs, across the front and started working their way up to the point where I thought maybe he was just brushing them. And then his hands were on my breasts, just like this, rubbing them.
>
> Q. Did you give him consent to do that to you?
>
> A. No, I did not.
>
> Q. What did you say to him after he did that to you?

4

A.   I didn't say anything to him.  I couldn't look at him.  I said: It's time to go back to the ship.

\* \* \*

Q.   Did he say anything to you about that incident a month later?
A.   Approximately a month later, sometime afterwards, he made reference to it.
Q.   What did he say to you?
A.   He said that we had almost made a mistake.
Q.   What did you say to him?
A.   I didn't say anything.  I was furious because I didn't think it was our mistake – I remember thinking that it was your mistake, I stopped it.  But I didn't say anything because I felt it was in the past.  So I just let him end the conversation.
Q.   Were you a willing participant in having him massage and rub your breasts?
A.   No, I was not.

(*R.* at 468-71.)  On cross-examination, she further testified:

Q.   [DC] So you and two enlisted men walked back to the ship?
A.   Yes.
Q.   Somebody suggested back rubs?
A.   Yes.
Q.   Did you?
A.   I don't remember.
Q.   It's possible?
A.   It is possible.
Q.   You were in a train, as you say, and at one point Petty Officer Campbell was behind you?
A.   The second time.
Q.   And you stated his hands came up around from behind towards your stomach in an upward –
A.   Yes.
Q.   Is that accurate?
A.   Across my ribs.
Q.   And his hands eventually made their way onto your breasts?
A.   Yes.
Q.   And he rubbed your breasts?
A.   Yes.
Q.   He did this for a couple of seconds, I take it?
A.   Yes.
Q.   Ten seconds, 10 to 15 seconds?
A.   I'll go with that.
Q.   You said one of the things that upset you later on was because Petty Officer Campbell had made a comment along the lines of, we almost did something, or we stopped something?
A.   He said: We almost made a mistake.

5

Q.  That offended you because it implied that you were a willing participant?
A.  Yes.
Q.  So Petty Officer Campbell gave you the impression that he thought you were a willing participant.  Did that upset you?
A.  Yes, it did.

\* \* \*

Q.  Did anyone outside of you and Petty Officer Campbell know what happened that night until after it was reported?
A.  No.  And I only told one person, and that was after I left the ship.
Q.  You certainly were aware that this was something that you had every right to take to the command, correct?
A.  No.
Q.  Why is that?
A.  Because I had rationalized it as my fault, that I was the JG, that I would get in trouble, that I placed myself in that situation.
Q.  You looked at it in terms of fraternization?
A.  I thought it would be looked at that way.
Q.  And it wasn't?
A.  No.
Q.  No one ever said anything to you about that?
A.  No.
Q.  No one thought it was unusual that you, a commissioned officer, were on a pier with two enlisted men giving back rubs in a – I have never been to American Samoa.  I presume it's palm trees and sand and it's kind of nice?
A.  It's kinds [sic] of nice.
Q.  No one ever said anything to you about that?
A.  No one ever saw it.  Back rubs are not your usual occurrence.
DC:  Thank you.  I have no further questions.

(*R.* at 473-77.)

Appellant contends that the conviction cannot stand because the circumstances described in the foregoing testimony establish the affirmative defense of mistake of fact as to consent. Appellant did not request an instruction on that defense and the military judge did not so instruct the court with respect to LT(jg) P, but he did instruct on mistake of fact with regard to eight other women.  That instruction correctly advised the court members that they should find Appellant not guilty of indecent assault or assault consummated by a battery, if they found that Appellant had a reasonable, but mistaken, belief that he had permission to touch the alleged victim in the manner found by the court.  The mistake as to consent must have existed in the mind of Appellant and it must have been based on matters that would indicate to a reasonable person that the woman consented.  Appellant did not testify at trial and, thus, did not assert to the court members that he mistakenly thought LT(jg) P had consented to his actions.  Nevertheless, we deem LT(jg) P's account alone sufficient to raise the issue of a reasonable belief of consent.

6

LT(jg) P acknowledged that she consented to Appellant's rubbing her neck, shoulders, and back, but denies that she consented to his touching of her breasts. There is no evidence that she told either of these petty officers exactly what they could or could not do, but by submitting to the back rub arrangement described in her testimony, which may have been suggested by her, she placed herself in a situation of undue familiarity as an officer with enlisted men. In our view, such an action could have indicated to a reasonable person that LT(jg) P was receptive to additional familiar touching. LT(jg) P rubbed Appellant's back, shoulders, and neck first. Then she told everyone to switch, further indicating that the whole arrangement likely was her idea. With the switching, Appellant started rubbing LT(jg) P's "general neck, shoulders, [and] back." After awhile, Appellant obviously decided to test the waters as to whether LT(jg) P was, in fact, consenting to more intimate touching. Appellant's hands came around down the ribs, across the front and started working their way up to her breasts, where they remained for ten to fifteen seconds without verbal objection or protest by LT(jg) P. Those acts did not occur instantaneously, and defense counsel underscored that fact with the court members in the following manner at closing arguments: "Does anybody assault someone for fifteen seconds? If you're offended by being touched, how long does it take you to react, ten to fifteen seconds? Think to yourself. That's a long time. If [you've] got a good quarterback, you could run a couple of plays in fifteen seconds." (*R.* at 813.)

The moment Appellant's hands moved from the back, to the ribs and across the front, LT(jg) P knew that Appellant had stopped rubbing her back and had embarked on something entirely different. Her failure to take action to stop this new direction was, in our view, sufficient to confirm in the mind of a reasonable person that she was consenting to this departure, which ultimately led to the touching of her breasts. Even then, she failed to take immediate steps to stop the fondling. A month later, when Appellant said to her that they had almost made a mistake, LT(jg) P continued to remain silent. Appellant's words to her convince us that he believed that she had consented to his actions, and that he further believed that it would have been a mistake for them to have continued down that consensual path as officer and enlisted. Our analysis of this evidence convinces us that Appellant's assignment of error V has merit as to Appellant's reasonable, but mistaken, belief that LT(jg) P consented to his actions. For this reason, we are unable to affirm, as correct in law and fact, the conviction of indecent assault or the lesser included offense of assault and battery upon LT(jg) P. Accordingly, we set that finding of guilty aside and reassess the sentence.

## II. Issues Relating to the Prior Nonjudicial Punishment for Offenses Before the Court

### A. Assignment of Error XIV

In Assignments of Error XII, XIII, and XIV, Appellant has raised issues with regard to his prior nonjudicial punishment for the same offenses. In Assignment XIV, Appellant states that the trial for these offenses amounted to double jeopardy. Our higher court held otherwise in *United States v. Pierce*, 27 M.J. 367 (CMA 1989), but this Court suggested in *United States v. Gammons,* 48 M.J. 762 (C.G.Ct.Crim.App. 1998) that recent Supreme Court opinions warranted another look at this subject by the Court of Appeals for the Armed Forces. That second look was taken on review of our *Gammons* decision, with our higher court reaffirming the holding of *Pierce* that a court-martial trial for serious offenses is not barred by prior nonjudicial punishment

for the same offenses. *United States v. Gammons*, 51 M.J. 169 (1999). Accordingly, Assignment of Error XIV is rejected.

## B. Assignment of Error XII

In Assignment XII, Appellant contends that the trial counsel committed prejudicial error during the case in chief by referring to a prosecution witness's earlier statement regarding Appellant's nonjudicial punishment. The earlier reference to Appellant's Mast was made by a witness in response to a defense question on cross examination. Defense counsel asked whether Appellant had ever carried out a threat to expose the witness's relationship with another crewmember and the response was "at the Captain's Mast." No further details with regard to that Mast were provided at that time or when the trial counsel asked a follow-up question on redirect examination. Given the fact that the first reference to the Captain's Mast was elicited by the defense, not the prosecution, and that the witness's responses did not make it clear that it was Appellant's Mast, which resulted in punishment for offenses before the court, we find no merit to the assigned error.

## C. Assignment of Error XIII

In Assignment XIII, Appellant has correctly asserted a violation by the trial counsel of the proscription against the prosecution's first bringing out the details of a prior nonjudicial punishment for the same offenses, and then commenting on that punishment as a matter in aggravation of the offenses. *See Gammons*, 51 M.J. at 180. Prior to sentencing, the trial counsel offered evidence of Appellant's prior punishment along with other entries from Appellant's service record. The defense raised no objection to these documents, however, and later offered the same evidence as part of defense matters in extenuation and mitigation of the offenses. Even though the prosecution was the first to argue on the sentence and made an argument for a higher sentence utilizing the prior punishment, the defense still did not object and later used the prior punishment in his argument for a lighter sentence. These facts are very similar to those in *Gammons*, 51 M.J. at 172, the main difference being that we have a members trial here as opposed to the judge-alone trial in *Gammons*. The Court of Appeals for the Armed Forces in *Gammons*, *id.* at 180, found no material prejudice to the gatekeeper rights of the accused from the sequence of events in that judge-alone trial, even though it would have been preferable, according to the Court, for the defense to have made substantive use of the prior punishment before it was entered in evidence by the prosecution. We see enough similarities in this members trial to warrant reaching the same result. There was no material prejudice to Appellant's substantial rights, and Assignment XIII is rejected.

## D. Sentence Credit for the Prior Punishment

Finally, although not raised by Appellant, we have looked to see whether proper credit against Appellant's sentence was given for the prior punishment. The convening authority properly ordered twenty-one days confinement credit based on the forty-two days of Mast-imposed restriction. No mention was made in that action, however, of the earlier reduction from E-6 to E-5, but the judge instructed the court members on this subject prior to sentencing in the following manner:

I'll specifically call[ ] to your attention the Accused's . . . prior non-judicial punishment for any of the same offenses. Since the accused was reduced in rate, you should only reduce him if, and to the extent that, you believe that a further reduction is warranted. For example, if you believe that a two-grade reduction is appropriate, you should reduce him only one more grade. However, if you believe that based on this offense, the accused should be no more than an E1 or an E3, or some other absolute level, you may sentence him accordingly.

(*R.* at 973-74.)

The first part of that instruction provided the court members sufficient guidance on how to credit for the earlier reduction when considering reduction of a certain number of grades; but the remaining portion of the instruction, relating to reduction to a particular level, makes it impossible for us to tell whether the earlier reduction from E-6 to E-5 was properly taken into consideration in arriving at the sentence of reduction to E-3. If the judge had told the members that they were to determine the appropriate reduced grade by treating Appellant as if he was being reduced from E-6 rather than E-5, we would have no trouble concluding that he was accorded the requisite credit. Given our doubts on this matter, we will ensure that there is proper credit by approving no more than a reduction to E-4.

## Conclusion

In light of the foregoing, the finding of guilty of specification 2 of Charge I, which finds Appellant guilty of indecent assault of LT(jg) P is set aside and the offense is dismissed. In addition, only so much of the findings of guilty of indecent assault in Specifications 1, 3, 5, and 7 of Charge I as finds Appellant guilty of the lesser included offense of assault consummated by a battery, in violation of Article 128, UCMJ, are affirmed. The remaining findings of guilty approved below are affirmed. The sentence has been reassessed in light of the reduced findings of guilty and we are confident that, even without the offenses that we have rejected, the trial court would have imposed no less than a bad conduct discharge, confinement for six months and reduction to E-3. Upon further reassessment, with appropriate crediting of the earlier reduction to E-5 in mind, we have determined that we should approve a sentence that includes a reduction to E-4 rather than E-3. Accordingly, only so much of the sentence approved below is affirmed as provides for a bad conduct discharge, confinement for six months, and reduction to E-4.

In further explanation of our action, we are fully aware that Appellant has completed service of his earlier approved confinement and that on its face our action may not appear to be a lessening of Appellant's sentence in any practical way. To the contrary, this reduced sentence has a real effect on the forfeitures imposed by Article 58b, UCMJ. Pursuant to that Article, Appellant was subject to forfeitures of all pay and allowances while confined, except for any period in which forfeitures were deferred or waived by the convening authority. With this Court's reduction of the approved confinement, Appellant is now entitled to a refund of any forfeitures collected while confined beyond the period affirmed by this Court, as further reduced by the twenty one days of confinement credit ordered by the convening authority, and any accorded good-time credit. Appellant's forfeitures should also be recalculated on pay at the

affirmed grade of E-4 rather than E-3. All rights, privileges, and property of which Appellant has been deprived by virtue of that portion of the sentence not affirmed by this Court shall be restored.

Judge KANTOR concurs.

WESTON, Judge (concurring in part and dissenting in part):

I concur with all in the principal opinion except for its action with respect to two of the findings of guilty and the sentence. I would set aside the finding of guilty of violation of a general order by sexually harassing Petty Officer T in Specification 3 of Charge IV, and I would dismiss that specification. I would also set aside the finding of guilty of indecent assault of Mrs. C. in Specification 6 of Charge I, and I would return the record of trial to the convening authority for a rehearing on that specification. I also would leave the sentence intact at this point in order for the convening authority to determine whether a rehearing or reassessment is appropriate.

In explanation, I expressly join with the majority's comments concerning the charges of indecent assault. The brief on behalf of Appellant makes a persuasive case that the Government was overzealous in charging relatively innocuous conduct as gross sexual assaults. It thereby bolstered the perceived seriousness of Appellant's conduct by both elevating the seriousness of the charges alleged beyond what a reasonable view of the evidence could support and also by emphasizing the sheer number of those allegations and the number of women portrayed as victims. The trial counsel's presentation of this case encouraged the fact-finders to conclude that Appellant was a sexual predator, preying on a large number of female shipmates – and the wife of a shipmate.

While I assume no malicious intent by the Government in its charging decisions in this case, I believe that there was insufficient sensitivity to the prosecutor's obligation to avoid over-reaching. Here it appears that, after dealing with many of the offenses in this case as the minor infractions they are, a complaint from the spouse of Appellant's shipmate resulted in a dragnet investigation that surfaced additional, relatively minor offenses plus a serious allegation involving a junior female commissioned officer. The relatively minor offenses were apparently and understandably given greater prominence due to the two serious allegations involving the officer and the spouse of a crew member. However, the added attention given to those more minor offenses did not justify portraying tickling and other relatively innocuous touchings as sexual assaults. *See United States v. Asfeld*, 30 M.J. 917, 929 (ACMR 1990).

Relying on the member fact-finders to sort this all out and to determine which offenses were proven beyond a reasonable doubt under these circumstances ran the risk of creating an improper "spillover" between the offenses. *See United States v. Baker*, 14 M.J. 361, 365 (CMA 1983); *see also United States v. Lane*, 474 U.S. 438, 446 (1986). The Appellant quite persuasively argues that the findings by the members that he was not guilty of several of the charged offenses do not eliminate the prejudice of spillover from unsupported allegations. Too many of the charged offenses appear to have been elevated beyond what the evidence could reasonably support, and, in my view, this requires corrective action.

Given this over-charging of Appellant's actions in this manner, I am not willing to assume that the members were not improperly influenced to resolve the doubts that they may have held in the more serious charges involving the wife of his shipmate and the female officer to his detriment. As discussed in the majority opinion, I agree that the issue of indecent assault against LT(jg) P should be resolved in Appellant's favor. Based on my concerns over the spillover effects on the alleged indecent assault on Mrs. C, I would return that charge to the convening authority for such further proceedings as it determines might be appropriate.

In short, by over-charging multiple, simple assaults as indecent assaults and arguing that this constituted a pattern of depraved conduct, the Government presented a case that actively encouraged the fact-finder to decide that Appellant was a person who had engaged in a pattern of indecent assaults, despite the paucity of evidence supporting such a conclusion on most of the charges. I am concerned that the members may have been overly influenced by these other, exaggerated charges in resolving any doubts they might have had concerning the allegations involving Mrs. C.

In a similar vein, I have concluded that Charge IV, Specification 3, violating a general order by sexually harassing Petty Officer T, has not been proven beyond a reasonable doubt. The evidence reflected that while Appellant was on liberty in a bar he engaged in a mutual conversation with a her about sexual matters and in the course of that conversation made a comment that amounted to a "pass" that was immediately rejected – and not pursued further. Under the circumstances, and given the paucity of objective evidence of a deleterious impact on this petty officer or the work environment, I am simply unconvinced that this amounted to sexual harassment.



For the Court,


//s//
Kevin G. Ansley
Clerk of the Court